# EXHIBIT A

E-FILED
IN COUNTY CLERK'S OFFICE
PIERCE COUNTY, WASHINGTON

November 17 2021 8:30 AM

KEVIN STOCK
COUNTY CLERK
NO: 21-2-08380-5

IN THE SUPERIOR COURT OF WASHINGTON FOR PIERCE COUNTY

| | |
|---|---|
| VITALIY BERYEZIN, as Personal Representative of the ESTATE OF SERGEY DEVYATKIN, Deceased, | NO. |
| Plaintiff, | **COMPLAINT FOR WRONGFUL DEATH** |
| v. | |
| AMERICAN PROCESS GROUP, INC, a Washington corporation; SYNAGRO WEST, LLC, a Delaware limited liability company; and SYNAGRO-WWT, Inc, a Delaware corporation, | |
| Defendants. | |

Plaintiff VITALIY BERYEZIN, as Personal Representative of the ESTATE OF SERGEY DEVYATKIN, Deceased, by and through his attorneys of record, Stritmatter Kessler Koehler Moore, alleges:

## I. PARTIES

1.  Plaintiff.  Vitaliy Beryezin is the duly appointed Personal Representative of the Estate of Sergey Devyatkin, Deceased, pursuant to the Order Appointing Personal Representative and Issuing Letters, entered in the Washington Superior Court in and for King County, cause number 21-4-03005-3 SEA. Plaintiff has signed an Oath of

COMPLAINT - 1

STRITMATTER KESSLER WHELAN
KOEHLER MOORE
3600 15th Avenue West, Ste. 300
Seattle, WA 98119
206-448-1777

1  Administrator/Personal Representative, entered in that action.  Sergey Devyatkin resided in the

2  state of Washington at the time of his death.

3    2.    <u>Plaintiff-in-Interest</u>.  The party in interest to the claims asserted by the Estate of

4  Sergey Devyatkin is Galina Mikhailovna Glebova, who is the natural mother of Sergey

5  Devyatkin.

6    3.    <u>Defendant American Process Group Inc</u>.  Defendant American Process Group,

7  Inc. ("APGI") is a for-profit corporation organized and existing under the laws of the state of

8  Washington, and at all times material to this action conducted business in Pierce County,

9  Washington, with its headquarters at 1201 Pacific Avenue, Suite 600, Tacoma, Washington

10  98402-4384.    APGI is a registered Washington general contractor, license number

11  AMERIPG927DS, and operates in Washington State under UBI number 602 477 526.

12  Defendant APGI resided in Pierce County, Washington at the time of the commencement of this

13  action within the meaning of RCW 4.12.020(3) and/or RCW 4.12.025.  At all times and for all

14  purposes pertinent to this action, the general nature of APGI's business has been dredging and

15  dewatering services. Defendant APGI's registered agent for service of process in Washington

16  State is Registered Agent Solutions, 3400 Capitol Boulevard S.E., Suite 101, Tumwater, WA

17  98501, with a mailing address of P.O. Box 1386, Olympia, WA 98507-1368.

18    4.    <u>Defendant Synagro West, LLC</u>.  Defendant Synagro West, LLC ("Synagro

19  West") at all times material to this action has been a for-profit limited liability company

20  organized and existing under the laws of the of the state of Delaware, with its headquarters at

21  435 Williams Court, Suite 100, Baltimore, MD 21220, and its principal place of business at 1800

22  Bering Drive, Suite 1000, Houston, TX 77057, is a registered Washington general contractor,

23  license number SYNAGWL945LA, and at all times material to this action conducted business in

24  COMPLAINT - 2

Washington State under Washington UBI No. 602 033 868.   Defendant Synagro West's registered agent for service of process in the state of Washington is CT Corporation System, 711 Capitol Way S., Suite 204, Olympia, WA 98501-1267. On information and belief, at all times and for all purposes pertinent to this action, the general nature of Synagro West's business has included acting as the services entity for the western region of its governing corporation, Synagro–WWT, Inc. On information and belief, Synagro West is a wholly owned and controlled subsidiary of Defendant Synagro–WWT, Inc.

5.   <u>Defendant Synagro–WWT, Inc.</u> Defendant Synagro–WWT, Inc. ("Synagro-WWT") at all times material to this action has been a for-profit corporation organized and existing under the laws of the of the state of Delaware, with its headquarters at 435 Williams Court, Suite 100, Baltimore, MD 21220, and at all times material to this action conducted business in Washington State under Washington UBI No. 602 686 535.   Defendant Synagro-WWT's registered agent for service of process in the state of Washington is CT Corporation System, 711 Capitol Way S., Suite 204, Olympia, WA 98501-1267.   On information and belief, at all times and for all purposes pertinent to this action, the general nature of Synagro-WWT's business has been to provide payroll services and other business services to Defendant Synagro West, and to act as the sole governor of Defendant Synagro West.

6.   <u>Agency</u>.  At all times and for all purposes pertinent to this action: Each employee of each Defendant was an agent of that Defendant with respect to the performance of construction work at the City of Marysville 2020 Biosolids Removal and Reuse Project site, and with respect to the unlawful and negligent manner in which safety obligations were breached at that site, which led to Sergey Devyatkin being injured and killed there.  Defendant Snyagro West was an agent of Synagro-WWT and *vice versa*.  Each wrongful act and omission of each

COMPLAINT - 3

Defendant's agent, which act and/or omission was a proximate cause of Sergey Devyatkin injuries and death, was committed within the course and scope of such agency.

## II.  JURISDICTION AND VENUE

7.  <u>Jurisdiction</u>.  The Superior Court of the State of Washington has jurisdiction over the subject matter and persons in this action because the incident complained of arose from Defendants' and/or their agents' commission of one or more tortious acts within the state of Washington and/or Defendants' and/or their agents' business contacts within the state of Washington, and/or Defendants and/or their agents' ownership, use and/or possession of property within the state of Washington, and the damages suffered by the Plaintiff exceeds three hundred dollars.

8.  Each Defendant has been or will be served with process in a manner required by Washington law.

9.  <u>Venue</u>.  Proper venue of this matter exists in The Superior Court of Washington in and for Pierce County, because the cause(s) of action herein arose at least in part in Pierce County, Washington, the tort(s) complained of was or were committed at least in part in Pierce County, Washington, the work relating to the acts complained of was performed at least in part in Pierce County, Washington and/or the Defendant APGI resided in Pierce County, Washington at the time of the commencement of this action within the meaning of RCW 4.12.020(3) and/or RCW 4.12.025.

## III.  FACTS

10.  <u>The Project</u>.  From May 2020 through November 2020, the City of Marysville, Snohomish County, Washington ("City") conducted its so-called "2020 Biosolids Removal and Reuse Project" ("Project"). The Project's goal was to remove approximately 15,100 dry tons of

COMPLAINT - 4

STRITMATTER KESSLER WHELAN
KOEHLER MOORE
3600 15th Avenue West, Ste. 300
Seattle, WA 98119
206-448-1777

1  stored biosolids from the City's wastewater treatment plant's aeration cells and lagoons. The

2  Project involved dredging, screening and dewatering the biosolids on a processing pad at the

3  south end of the lagoons. From there, the processed biosolids were trucked to a so-called

4  Beneficial Use Facility for disposal.

5       11.    Low Bidder APGI.  On April 13, 2020, the City awarded Defendant APGI the

6  right to perform the Project, because APGI's bid of $8,397,697 was the lowest of the three

7  qualified bids the City received.  A true and correct copy of the award letter is attached hereto as

8  **Exhibit A.**

9       12.    Management Reserve.  Upon awarding the Project bid to Defendant APGI, the

10 City set a so-called "management reserve" for the Project in the additional amount of

11 $419,884.85, for a total amount allocated to the Project of $8,817,581.85.

12      13.    Other Bidders.  Defendant Synagro West submitted a bid for the Project in the

13 amount of $9,610,000.  An entity called Merrell Brothers submitted a bid for the project in the

14 amount of $9,597,000.

15      14.    City's Estimate.   The City's engineer estimated the project would cost

16 $9,235,000.

17      15.    Safety Statement.  Defendant APGI's bid for the Project submitted March 31,

18 2020 made the following statement, in which "APG" refers to APGI:

> Safety influences our actions, guides our decisions and shapes our culture. We
> believe our employees are entitled to productive, healthy careers in an incident-
> free workplace. We extend this philosophy further - to include our employees'
> family members, our contractors, all other APG stakeholders and every
> community in which we perform our work. All personnel are trained in First
> Aid, H2S Alive, WHMIS and most are trained in Confined Space Entry &
> Rescue. We comply with the latest OSHA and OH&S safety standards as well
> as the workers compensation board and any other local jurisdictions in place
> where the work will be performed.

24  COMPLAINT - 5

STRITMATTER KESSLER WHELAN
KOEHLER MOORE
3600 15th Avenue West, Ste. 300
Seattle, WA 98119
206-448-1777

1

2

3

> The Electrical buildings will contain fire extinguishers and a first aid kit will be kept in the onsite office. While on site, all personnel will wear proper Personal Protective Equipment including steel toe boots, hardhat, and safety glasses with side shields. …

4    16.    <u>Dewatering System</u>.  The Project used a dual augur temporary sludge dewatering

5  system ("Dewatering System") to extract water from sediment that had been dredged from the

6  City's sewage treatment settling ponds.

7    17.    <u>Screening Unit</u>.  The Dewatering System had a component called the "Screening

8  Unit". The Dewatering System was designed to work as follows: Debris dredged from the

9  settlement ponds is deposited onto the top of the Screening Unit..  Below the screen is a tank.

10  The dredged debris falls through the screen into a tank.  Some dredged debris is too large or

11  otherwise configured (such as hair and/or other stringy or floppy material) to go through the

12  screen. That material remains atop the screen or is caught in the screen.  Below the screen, in the

13  tank, dual augurs separate larger debris that has come through the screen from the sludge's finer

14  components. The augurs push that larger debris forward and out of the tank to the end of the unit.

15  There the larger debris pieces are ejected from the Screening Unit. The water and biosolids left

16  behind are mixed with a polymer coagulating powder and water.  From there, the biosolids are

17  pumped into the centrifuges, which remove most of the water from that mixture and drop the

18  dewatered solids onto a ground-level area where they can be collected and hauled away by truck.

19    18.    <u>Photo of Screening Unit</u>. Below are photos of the Screening Unit taken by the

20  Marysville Police Department as part of its investigation shortly after Sergey Devyatkin's death.

21

22

23

24  COMPLAINT - 6

STRITMATTER KESSLER WHELAN
KOEHLER MOORE
3600 15th Avenue West, Ste. 300
Seattle, WA 98119
206-448-1777

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23



24   COMPLAINT - 7

19.   Screens and Augurs. Below is a photo taken by the Marysville Police Department as part of its investigation shortly after Sergey Devyatkin's death, showing the top of the Screening Unit and screen panels.   The augurs are located below the metal screens. The Screening Unit is designed so that the augurs are powered and can rotate without the screens in place.



20.   Worker Access.  Below is a photo taken by the Marysville Police Department as part of its investigation shortly after Sergey Devyatkin's death, showing the path of worker access to the top of the Screening Unit.

COMPLAINT - 8





COMPLAINT - 9

21. <u>Acquisition of Dewatering System</u>.  Defendant APGI leased some or all of the Dewatering System from, on information and belief, Defendant Synagro West.  On information and belief, Synagro West knew, or reasonably should have known, and could reasonably foresee, that the Screening Unit it provided to Defendant APGI was to be used on the Project. On information and belief, Synagro West had leased or purchased some or all of the Screening Unit from Pace Dewatering Systems ("Pace DS").

22. <u>Manual</u>.  On information and belief, neither Defendant APGI nor Defendant Synagro West requested any type of operator's manual with the Screening Unit prior to Sergey Devyatkin's death.

23. <u>Unused</u>.  The Dewatering System was unused from the time Synagro West acquired it from Pace DS until it was delivered to APGI's worksite at the Project and placed into service.

24. <u>Replacing Brushes</u>.  The augers are designed with brushes that continually clean the augur. Over time, the brushes wear down and/or are damaged, and become less and less effective.  To replace the brushes requires that the machine be stopped and the augurs be removed; a process that takes approximately an entire work day.

25. <u>Hosing Screen</u>.  At the Project, APGI employees used a hose to spray the Screening Unit's screens several times per work shift, because the screens become clogged with debris.

26. <u>Hosing Dual Augurs</u>.  At the Project, APGI employees used a hose to spray the Screening Unit's dual augurs and brushes, because doing so reduced brush wear, and once the brushes began to wear significantly, cleaned the augurs.   In order to clean the augurs and brushes efficiently, APGI employees sprayed them while the augurs were turning. Doing so was

COMPLAINT - 10

STRITMATTER KESSLER WHELAN
KOEHLER MOORE
3600 15th Avenue West, Ste. 300
Seattle, WA 98119
206-448-1777

1    regarded by APGI as faster, cheaper and less messy than spraying and/or otherwise cleaning

2    them while the augurs were motionless.

3        27.    Cleaning frequency.    One of APGI's workers at the Project reported to the

4    Washington State Department of Labor and Industries ("L&I") that once the Screening Unit's

5    augur cleaning brushes started to wear out, the brushes had to be sprayed out twice a night for

6    two nights, then ten times per night for two nights.

7        28.    Worker Position During Cleaning.    To hose down the Screening Unit's screen

8    panels and/or the rotating augurs and their brushes, the common practice at the Project was for

9    the APGI worker to stand on the Screening Unit's screen panel catwalk, and to lift a screen panel

10   out of position as a catwalk component so that the panel could be cleaned effectively. Removing

11   the panel from its position as part of the catwalk removed the only physical barrier between the

12   worker and the opening above the augurs created by the removed screen panel. In other words,

13   removing the screen created a screen-size hole in the catwalk above the augurs below; a hole

14   large enough for a person to fall through.

15       29.    Brush Change-August 10, 2020.    According to APGI's Tower Sheet, Bates No.

16   APG 00129 submitted to L&I, on August 10, 2020, during the work shift from 6:00 a.m. to 6:00

17   p.m., APGI replaced the Screening Unit's brushes, and fixed a bearing shaft for the left side

18   brush.

19       30.    The Incident.    On or about August 13, 2020 at about 4:00 a.m., Sergey Devyatkin

20   was employed by APGI as a laborer assigned to clean the Screening Unit.   He climbed up the

21   Screening Unit. He fell through a hole created by a removed screening panel and into the rotating

22   equipment augurs while they were operating. He screamed.   The augurs struck, pinched, cut,

23   tore, dismembered and otherwise mutilated his body, causing terrible injuries from which he

24   COMPLAINT - 11

STRITMATTER KESSLER WHELAN
KOEHLER MOORE
3600 15th Avenue West, Ste. 300
Seattle, WA 98119
206-448-1777

1   died.  The augurs spit his body parts out the end of the Screening Unit, where they fell into a

2   heap on the ground.

3       31.   <u>L&I Depiction</u>.   Below is a true and accurate copy of a page from the L&I

4   investigation of Sergey Devyatkin's death, in which L&I indicates one of the Screening Unit's

5   screens was removed to permit access to the augurs for cleaning. On information and belief, the

6   removal of this screen created the hole into which Sergey Devyatkin fell.



Photo ID Sheet            Page 1 of 1

| Division of Occupational Safety & Health MS: 44632 | | PHOTO IDENTIFICATION Single |
|---|---|---|

| Inspection Number 317960582 | Photo Date/Time 8/15/2020 2:33 PM | Photographer ID X0946 - TROY STANSEL-GARNER | UBI 602477526 |
|---|---|---|---|

Name of Employer
AMERICAN PROCESS GROUP INC/AMERICAN PROCESS GROUP INC

3rd screen EE lifted to access the augers for cleaning

| Disc # | Photo ID # IMG_1715 with description added.png | | Citation/Item # 1-2 |
|---|---|---|---|

Location of Hazard
80 Columbia Avenue Marysville WA 98270

Description of Photo
Photo showing location of screen EE opened to access the rotating dual augers to perform cleaning.

F418-024-000 Photo-ID Single 9-06

317960582 PAGE 33

24   COMPLAINT - 12

STRITMATTER KESSLER WHELAN
KOEHLER MOORE
3600 15th Avenue West, Ste. 300
Seattle, WA 98119
206-448-1777

1     32.   <u>Death</u>. Sergey Devyatkin died on August 13, 2020.

2     33.   <u>Contractor</u>.  Defendant APGI was the City of Marysville's selected contractor for the Project. Defendant APGI performed the functions and duties of a general contractor at the Project.

34.   <u>Control</u>.   Defendant APGI had a contractual responsibility to control the job site, including but not limited to the portion of the construction site where Sergey Devyatkin sustained fatal injuries. Defendant APGI retained a right to control the manner in which its employees were equipped, and in which they operated machinery and equipment, cleaned the Screening Unit, and otherwise performed their work at the Project.  Defendant APGI managerial personnel selected, procured and were familiar with the function, features and operation of the Screening Unit.

35.   <u>Regulatory Safety Responsibilities</u>.  Defendant APGI had rights and responsibilities arising from Washington statutes and regulations:

     a.   to equip its workers with personal protective equipment at the Project; and

     b.   to control the jobsite activities of the personnel who oversaw and enforced workplace safety rules and policies with regard to the Project.

36.   <u>Contractual Safety Responsibilities</u>.   The City of Marysville required that Defendant APGI conform to worker safety laws at the Project site. The 2020 Biosolids Project Manual, which was incorporated by reference into the Project contract between the City and Defendant APGI, provided, in part, as follows, under Subsection 1-07.1:

> The Contractor shall have sole responsibility for the safety, efficiency, and adequacy of the Contractor's plant, appliances, and methods, and for any damage or injury resulting from their failure, or improper maintenance, use, or operation. The Contractor shall be solely and completely responsible for the conditions of the project site, including safety for all persons and property in the performance of

COMPLAINT - 13

STRITMATTER KESSLER WHELAN KOEHLER MOORE
3600 15th Avenue West, Ste. 300
Seattle, WA 98119
206-448-1777

the work. This requirement shall apply continuously, and not be limited to normal working hours. The required or implied duty of the Engineer to conduct construction review of the Contractor's performance does not, and shall not, be intended to include review and adequacy of the Contractor's safety measures in, on, or near the project site.

37.    <u>Site Specific Safety Plan</u>.  Defendant APGI authored, and submitted to the City of Marysville, a Site Specific Safety Plan for the Project, dated May 14, 2020. A true and correct copy of that document is attached hereto as **Exhibit C**.  That document referred to APGI as "American Process Group" and "APG". The document provided, in part:

    a.  At Section 1.2, "Overall General Responsibility for Safety":

        i.  "American Process Group will ensure that the work site health and safety of all the APG workers involved is maintained during every aspect of the work being performed."

        ii.  "APG will also establish a system of regular inspections (possible inclusion of an internal safety audit) that will include all personnel and subcontractors to ensure that compliance is maintained."

        iii.  "APG will ensure all work to be performed in the designated areas of this project will be carried out in accordance with all applicable federal, provincial, civic & municipal acts or regulations."

    b.  At Section 1.3, "Specific Responsibility for Safety":

        i.  Under "Project Manager":

            1.  "Ensure all tools and equipment required to execute the job safely are available and maintained in safe working order."

            2.  "Include HSE observation as part of walkabouts."

            3.  "Take corrective action on observed non-compliance issues."

COMPLAINT - 14

STRITMATTER KESSLER WHELAN
KOEHLER MOORE
3600 15th Avenue West, Ste. 300
Seattle, WA 98119
206-448-1777

4. "Conduct H&S inspections of work area, direct corrective action for unsafe conditions noted and inform the H&S (site and corporate) of inspection results."

    ii. Under "Safety Officer":

1. "Lead by example."

2. "Assist project management and supervision in incident prevention, investigation, analyses, and preparation of reports and summaries."

3. "Ensure that corrective actions have been implemented whenever deficiencies have been identified."

    iii. Under "Corporate Safety":

1. "Responsible for the development, implementation, coordination and management of APG's Health and Safety program."

2. "Ensure corporate compliance with APG's H&S program, client requirements, and applicable provincial and federal OH&S regulations."

3. "Conduct internal audits, develop and implement action plans upon completion of audits."

4. "Maintain APG's corporate H&S record keeping system, which includes tracking incidents/accidents, training, and frequency and severity rates."

  c. At Section 1.5, "Guiding Documents for Safety": "American Process Group will endeavor to determine the best practice for all work activities undertaken

COMPLAINT - 15

throughout the duration of the project. APG will also follow the most stringent provincial and federal Occupational Health, Safety and Environmental regulations that apply specifically to the work that is being undertaken at this work-site.  The following documents will be used to guide the safety process at the designated worksites(s) for the duration of this project:

> • OSHA Regulations
> • APG's Site Specific Safety Plan
> • APG's Health, Safety & Environment Policies
> • APG's Worksite Safety Binder
> • SDS online/ safety binder

d.  At Section 3.1, "Hazards Identified at the Worksite":  "The hazards / risks identified at this work-site are as follows:

- Injury to APG worker(s) or members of the public, on and adjacent to the actual work-site; …

- Slip / trip hazards (Uneven surfaces, water, unseen objects / debris, loose stones, rocks, etc…); …

- Improper proper personal protective equipment ("PPE"), tools or equipment;

- Spinning / rotating parts of conveyors and equipment (cut hazard, flying stones and other debris); …

- Working on or near water; …

- Working at heights. …"

e.  At Section 3.2, "Hazard Mitigation":

- "Fall Protection equipment & documented plans."

COMPLAINT - 16

1          • "Fencing around conveyors."

2          38.   APGI's Lock Out/Tag Out Program.   Prior to Sergey Devyatkin's death,

3   Defendant APGI had created a written Lock Out/Tag Out Program.

4          a.   APGI's written Lock Out/Tag Out Program, at page 1, item 3, states:

5              "All authorized employees must isolate the energy supply by following the

6              appropriate APG Lockout procedure where the starting of the machine,

7              inadvertent movement of the machine or its parts, or inadvertent release of other

8              energy could cause injury to a person. This MUST be done prior to performing

9              any work or maintenance on that machine."

10         b.   APGI's written Lock Out/Tag Out Program, at page 2, item 12, states:

11             "The Manager of Operations where applicable, and the Project Manager when the

12             maintenance to be done is under the direction or control of the Project Manager,

13             shall ensure that the lockout procedures are maintained, enforced, and made

14             available to all employees and contractors."

15         39.   Site-Specific Lock Out/Tag Out.   APGI's Project Manager, Olegsandr ("Alex")

16  Krynitskyy, told L&I that to lock out the Screening Unit, he would shut off the circuit breaker in

17  a worksite trailer; but he did not know how other employees did it.  Mr. Krynitskyy told APGI

18  laborer, Ryan Smith, that whether to clean the Screening Unit while it was running was at the

19  worker's discretion. Mr. Smith trained Sergey Devyatkin, but aboard the barge, not while

20  together on the Screening Unit.

21         40.   No Lock Out/Tag Out Training.   Sergey Devyatkin did not receive Lock Out/Tag

22  Out training.

23

24  COMPLAINT - 17

41.   <u>Non-performance of Lock Out/Tag Out</u>.  Mr. Smith never saw lock out/tag out being performed.

42.   <u>No Assessment</u>.  On information and belief, APGI did not conduct an assessment of the hazards associated with the leased dual auger Screening Unit before putting it into service and allowing employees to work with it.<u>Screen Washing Frequency</u>.  At the end of a shift prior to the one on which Sergey Devyatkin was killed, APGI's Project Manager, Olegsandr Krynitskyy asked Sergey Devyatkin why he was not atop the Screening Unit more, and told Sergey Devyatkin that he should be washing the screens on the Screening Unit at least 12 times per shift.  Sergey Devyatkin replied that he had worked up there for 12 hours at a time and that it is not effective to wash through the screens; rather, he had to lift them instead. Neither Mr. Krynitskyy nor anyone else at APGI used this information to enforce and/or implement safety rules and/or practices with respect to cleaning the screens that would ensure a worker doing so did not fall onto the augurs.

43.   <u>No Safety Oversight</u>.  On information and belief, no APGI safety professional was present on Sergey Devyatkin's worksite during the work shift on which he was killed. Defendant APGI had no effective means in place at the Dewatering System to discover whether night shift workers, including but not limited to Sergey Devyatkin and his coworkers, on the night he was killed, were complying with safety and health standards prior to his death.

44.   <u>Unreasonable Communication</u>.   On information and belief, APGI did not reasonably communicate its safety and health policies with respect to Sergey Devyatkin.

45.   <u>Unreasonable Application and Enforcement</u>.   On information and belief, APGI did not reasonably apply and enforce its safety and health policies with respect to Sergey Devyatkin.

COMPLAINT - 18

46.   <u>Willful and Wanton Noncompliance</u>.   On information and belief, Defendant APGI, willfully and wantonly ignored its own Site Specific Safety Plan with regard to the circumstances that caused Sergey Devyatkin's death.  Well before his death, Defendant APGI knew:

    a.   Safety incidents and accidents could occur, and would occur in general on APGI projects, having developed a system to track them.

    b.   Specific hazards existed at the Project, which included but were not limited to slipping, working around mud, slime and water, working at heights suspended over spinning / rotating augur conveyors that presented cut hazards unprotected by proper personal protective equipment including but not limited to fall protection, such as a harness.

    c.   A worker should be thoroughly trained and supervised in safe job practices and in job-specific safety measures.

    d.   A worker should have the proper PPE.

    e.   All safety rails and guards should be in place.

    f.   A worker should maintain three points of contact when climbing on equipment.

    g.   Workers can feel pressure to perform, even under unsafe conditions, for fear of losing their jobs.

    h.   Working atop the Screening Unit was inherently dangerous to its workers, for reasons that included, but were not limited to:

        i.   The top of the unit, including the catwalk screen panels over the augurs, was sloped, not level.

COMPLAINT - 19

STRITMATTER KESSLER WHELAN
KOEHLER MOORE
3600 15th Avenue West, Ste. 300
Seattle, WA 98119
206-448-1777

    ii.  The catwalk screen panels were made of metal, and slippery when in contact with wastewater and settlement pond debris.

    iii.  The fall height from the top of the Screening Unit was sufficient to cause serious and/or fatal injury from falling alone; in some places approximately 14 feet.

    iv.  No fencing or other guard blocked a worker atop the catwalk from entering the void created over the augers when a screen panel was removed.

    v.  No lock out/tag out procedure was in place or was generally being followed while workers cleaned the screen panels.

    vi.  No interlock prevented the augers from turning when a Screening Unit screen panel was removed.

    vii.  No designated attach point for a safety harness for workers on the Screening Unit catwalk existed.

    viii.  APGI neither required nor provided workers a safety harness for use atop the Screening Unit catwalk.

    ix.  It was patently foreseeable that a worker atop the Screening Unit would be unable to continually maintain three points of contact with fixed parts of the structure, especially while removing a screen panel and/or using a hose.

    x.  The design and application to the Project of the Screening Unit invited cleaning it under dangerous conditions.

  i.  Sergey Devyatkin had not received lock out/tag out training.

COMPLAINT - 20

STRITMATTER KESSLER WHELAN
KOEHLER MOORE
3600 15th Avenue West, Ste. 300
Seattle, WA 98119
206-448-1777

j.   Employees not trained to ensure understanding and the skill necessary to carry out the energy control program may not be able to follow the procedures, thus exposing them to moving machinery which would cause permanently disabling or fatal injuries.

k.   APGI did not conduct site specific assessment of the hazards associated with the leased dual auger Screening Unit before putting it into service and allowing persons to work atop it.

l.   No APGI safety professional was present on Sergey Devyatkin's worksite during the work shift on which he was killed, and APGI had no effective means in place at the Dewatering System to discover whether night shift workers, including but not limited to Sergey Devyatkin and his coworkers on the night he was killed, were complying with safety and health standards.

m.   APGI did not reasonably communicate its safety and health policies to Sergey Devyatkin.

n.   APGI did not reasonably train Sergey Devyatkin.

o.   APGI did not apply its safety and health policies to Sergey Devyatkin.

Accordingly, Defendant APGI was aware that failure to implement protections against such hazards, particularly under the conditions Sergey Devyatkin faced, would inevitably lead to a worker's injury.  In fact, as the L&I investigation revealed, Ryan Smith, who was one of Sergey Devyatkin's co-workers, *told Sergey expressly* that *if he were to fall into the tank, he would die*. On information and belief, APGI's corporate managers had the same knowledge that death would certainly occur, if the dual augurs were in operation at the time of the fall. And yet, Defendant APGI put him into that position, exposing him unnecessarily to extraordinarily risky

COMPLAINT - 21

1   and illegal work conditions in order to do his menial job, without adequate and legally required

2   protections, so that APGI could squeeze more profit out of its lowest bid.

3         47.   <u>Labor & Industry Investigation.</u>   The Washington Department of Labor &

4   Industries ("L&I"), Division of Occupational Safety and Health ("DOSH") investigated

5   circumstances surrounding the death of Sergey Devyatkin.

6         48.   <u>Labor & Industry Findings</u>.   L&I DOSH's investigation wrote to Sergey

7   Devyatkin's mother, Glebova Galina Mikhaylovna, in care of her attorneys, on or about January

8   21, 2021.  That letter stated, in part:

> DOSH's inspection identified several areas that we believe contributed to this
> tragic event.  The investigation revealed that the employer was allowing
> employees to access the top of the Screening Unit to conduct cleaning
> operations without first ensuring that proper energy control procedures were
> developed and implemented, as well as ensuring all employees were trained in
> those procedures.  Covers over the Screening Unit were removed during
> cleaning operations exposing workers to hazardous energy in the form of a
> rotating auger system.  Health and safety codes in the State of Washington
> prohibits those activities unless the energy source has been adequately
> controlled to prevent serious injury or death.  Additional code violations were
> also discovered during the course of the investigation, but not necessarily
> related, or contributing to this tragic event. Those included the lack of a proper
> guard rail system on the top of the Screening Unit, and failing to properly
> identify confined spaces in the workplace by signage or other means.

By "the employer", DOSH meant Defendant APGI.  A true and correct copy of the letter is

attached hereto as **Exhibit B**.

        49.   <u>Labor & Industry Violations</u>.   L&I DOSH's investigation found that Defendant

APGI had committed serious violations of the following industrial safety regulations:

        a.   WAC 296-803-20005(5):

> The employer did not ensure that the energy control procedures identified
> the specific procedural steps as required by the code.

COMPLAINT - 22

STRITMATTER KESSLER WHELAN
KOEHLER MOORE
3600 15th Avenue West, Ste. 300
Seattle, WA 98119
206-448-1777

The employer's energy control program did not have energy control procedures for the Screening Unit that identified what the specific procedural steps are for shutting down, isolating, blocking, and securing the machine or equipment, the placing, removing, and transferring lockout or tagout devices, and who is responsible for them, and how to test the machine or equipment to verify the effectiveness of the lockout devices, and other energy control measures.

Energy control procedures that are not established expose workers to hazards from unexpected start up or unaccounted for energy sources that could cause permanently disabling or fatal injuries.

b.  WAC 296-803-40005:

The employer did not ensure that an appropriate means to control energy was applied.

Three laborers were conducting cleaning and/or clog and jam clearing operations on the Screening Unit without an appropriate means to control energy having been applied.

Workers conducting cleaning and/or clog and jam clearing operations without having a means to control energy applied would be exposed to the unexpected startup of that machine and would sustain injuries requiring hospitalization or a fatal injury.

c.  WAC 296-803-60005(1):

The employer did not ensure employee training on the energy control program was completed.

The laborers were conducting servicing and cleaning of the dual auger Screening Unit on the Biosolids reclamation project site without the necessary training to ensure they understood the purpose and function of the energy control program and had the knowledge and skill necessary to carry out the program responsibilities.

Employees not trained to ensure understanding and the skill necessary to carry out the energy control program may not be able to follow the procedures, thus exposing them to moving machinery which could cause permanently disabling or fatal injuries.

d.  WAC 296-24-75011(1)(b):

The employer did not ensure that a guard rail had an intermediate rail.

COMPLAINT - 23

The guard rail on the Screening Unit did not have an intermediate rail exposing workers to a fall of approximately 14 feet.

A fall from approximately 14 feet may cause injuries that could/result in hospitalization or death.

## IV. CAUSE OF ACTION:  DELIBERATE INJURY BY DEFENDANT APGI

50.     Prior allegations.  Plaintiff incorporates his prior allegations.

51.     Duties.  Defendant APGI had a duty to Sergey Devyatkin to ensure that all work conditions on the Project construction site complied with the Washington Industrial Safety and Health Act, Chapter 49.17 RCW ("WISHA"), and the regulations promulgated pursuant thereto by the Washington Department of Labor and Industries, including without limitation Chapter 296-115 WAC.  Defendant APGI had a non-delegable duty to its Project workers, including but not limited to Sergey Devyatkin, to follow required and/or otherwise reasonable worksite safety practices in order to furnish a Project site free from recognized hazards that may cause serious injury or death.

52.     Breaches.  By the acts and omissions described above, Defendant APGI breached its duties of care owed to Sergey Devyatkin by promoting, practicing and/or tolerating unsafe working conditions at the time of the incident, by failing to manage, supervise and enforce safety rules in the work area where the incident occurred, by failing to protect, inspect and properly illuminate the work area where the incident occurred, by failing to instruct, train and warn the workers in the incident area of the dangers of working in an area where a worker could fall into the Screening Unit tank and the proper safety procedures applicable to the work they were doing on the day of the incident, by failing to perform an activity hazard analysis for the type of work being done at the time and location of the incident, by failing to provide guards, barriers, tie-offs, and personal protective equipment, by failing to take other reasonable steps to make the Project

COMPLAINT - 24

site reasonably safe with respect to such work, and/or, on information and belief, by failing to enforce worksite safety measures including but not limited to the Defendant's own safety standards, procedures and protocols.

53. <u>State Regulatory Violations</u>.   By the acts and omissions described above, Defendant APGI violated WISHA, and the regulations promulgated pursuant thereto by the Washington Department of Labor and Industries and effective as of the date of the actions and omissions that led to the incident that is the basis of this lawsuit.

54. <u>Deliberate Intention to Harm Employee</u>.  Defendant APGI's deliberate indifference as manifested by its willful and wanton actions and omissions described above demonstrate a "deliberate intention" to produce Sergey Devyatkin's injuries and death, within the meaning of RCW 51.24.020.  Defendant APGI had actual knowledge that injury and death were certain to occur if a worker were to fall onto rotating augurs; and actually knew that an injury due to a fall from the catwalk was not only possible, but highly likely to occur eventually under the constant highly dangerous work conditions at the Project. Defendant APGI not only willfully disregarded that knowledge but demanded that its illegally undertrained, under-supervised and unprotected employees engage in the extremely risky activity of using a hose in the dark on a slanted, slimy metal grate above an open hole containing sharp and/or churning augurs.

55. <u>Causation and injuries.</u> The "deliberate intention" of Defendant APGI, as described above, caused Sergey Devyatkin to experience extensive bodily injury including goring and dismemberment, pain, suffering, anxiety, fear, and extreme terror, and to die a horrific death. As a consequence, he also lost future wages and earning opportunities. As a result

COMPLAINT - 25

STRITMATTER KESSLER WHELAN
KOEHLER MOORE
3600 15th Avenue West, Ste. 300
Seattle, WA 98119
206-448-1777

1    of his death, Sergey Devyatkin's mother suffered the loss of her son's consortium, including but

2    not limited to love, affection, care, guidance, society, and companionship.

3        56.    <u>Damages</u>.   The aforementioned injuries to Sergey Devyatkin caused his Estate to

4    suffer special damages for expenses of medical attention, funeral/memorial and burial, lost

5    wages and earning opportunities, and caused him and his mother to suffer general damages, in

6    amounts to be proved at trial.

7                    **V.  <u>CAUSE OF ACTION: PRODUCT LIAIBLITY</u>**

8        57.    <u>Prior Allegations</u>.  Plaintiff incorporates his prior allegations.

9        58.    <u>Synagro Purchase of Pace DS Capital Assets</u>.   On or about March 17, 2020, a

10   little less than five months before Sergey Devyatkin was killed, Synagro published a press

11   release containing the following text:

12
13           Synagro Technologies, Inc., the preeminent provider of biosolids and residuals
             solutions services in North America, today announced that it has acquired capital assets
             from Pace Dewatering Systems, an Edmonton, Alberta, Canada supplier of centrifuge
14           technology.

15           "This acquisition enables our continuing rapid growth in biosolids services and our
             ongoing multimillion-dollar investment in developing and maintaining North
16           America's most extensive fleet of biosolids management equipment," said Bob Preston,
             president and chief executive officer, Synagro. "It also broadens our portfolio
17           substantially and furthers our leadership position as the only biosolids management
             company to offer a full facilities, rail and services portfolio."

18
             "Pace's unique process and equipment design, as well as reliable state-of-the-art
19           dewatering technology, has consistently produced unparalleled results," added Preston.
             "This investment underscores our commitment to making significant infrastructure,
20           industry, equipment and customer investments."

21           Pace has operated rental or temporary sludge dewatering contracts in almost every
             Canadian province and a large percentage of U.S. states including California, Florida,
22           Massachusetts, New Jersey, Texas, Washington and others.

23

24   COMPLAINT - 26

"We already had the largest fleet of biosolids centrifuges in North America," added Mike Myers, director, Sales & Operations, Synagro. "This extends our lead to 32 centrifuges while our closest competitor has only six.

59. <u>Most Experienced Team</u>.  In its press release on or about March 17, 2020, Synagro Technologies, Inc. announced that it has "the most experienced team in the [industrial water and wastewater] industry."  Defendant Synagro Technologies, Inc. is a corporate affiliate of Defendants Synagro West and Synagro-WWT, and at the time of that announcement considered the latter two entities  part of that "most experienced team".

60. <u>Screening Unit Acquired and Leased</u>.  Defendant Synagro West acquired the Screening Unit from Pace DS, and leased it to Defendant APGI.

61. <u>Plans and Specifications</u>.  On information and belief, subject to further investigation and discovery: (a) Defendant APGI developed the plans and specifications for the Dewatering System, including but not limited to selection and incorporation of the Screening Unit component of the Dewatering System. (b) Defendant Synagro West selected the Screening Unit and represented to Defendant APGI that the Screening Unit was appropriate for incorporation into the Dewatering System at the Project.  (c) Defendant Synagro West designed, produced, made, fabricated constructed and/or remanufactured, as a component of the Dewatering System, the Screening Unit for its sale or lease within the meaning of RCW 7.72.

62. <u>Installation.</u>  On information and belief, and subject to further investigation and discovery, Defendant APGI, with or without the assistance of Defendants Synagro West and/or Synagro-WWT, installed the Screening Unit at the subject job site.

63. <u>Manuals.</u> Defendant Synagro did not provide Defendant APGI or the City of Marysville with any operation or maintenance manual for the Screening Unit.

COMPLAINT - 27

STRITMATTER KESSLER WHELAN
KOEHLER MOORE
3600 15th Avenue West, Ste. 300
Seattle, WA 98119
206-448-1777

64.    <u>Relevant Product</u>.  The Dewatering System, each of its components (including but not limited to its Screening Unit and the components of that unit), and each of its instructions and/or manuals, is each a "product" and a "relevant product" within the meaning of the Washington Product Liability Act, Chapter 7.72 of the Revised Code of Washington.

65.    <u>Product Seller</u>. On information and belief, subject to further investigation and discovery, each Defendant is a "product seller" of a relevant product and/or a component of a relevant product within the meaning of the Washington Product Liability Act, Chapter 7.72 of the Revised Code of Washington, because each Defendant engaged in the business of selling some or all of a relevant product that injured and killed Sergey Devyatkin; and/or each Defendant has as a matter of law, by virtue of direct or vicarious liability, successor liability, and/or otherwise,  acquired the liabilities of a "product seller" with respect to a relevant product.

66.    <u>Manufacturer</u>.  On information and belief formed after reasonable inquiry, subject to further investigation and discovery, each Defendant is a "manufacturer" of a relevant product within the meaning of the Washington Product Liability Act, Chapter 7.72 of the Revised Code of Washington, because each Defendant designed, made, fabricated, constructed, and/or remanufactured, and/or had the contractual and/or designated responsibility to design, make, fabricate, construct and/or remanufacture, and/or marketed or branded under its name some or all of the relevant product that injured and killed Sergey Devyatkin; and each Defendant has as a matter of law, by virtue of direct or vicarious liability, successor liability, RCW 7.72.040(2), and/or otherwise, acquired the liabilities of a "manufacturer" within the meaning of the Washington Product Liability Act.

COMPLAINT - 28

## A.  <u>DEFECTIVE DESIGN</u>

67.  <u>Design Defects</u>.  The relevant product that injured and killed Sergey Devyatkin was defective and not reasonably safe as designed because, at the time of manufacture, the likelihood that the product would cause his harm or similar harms, and the seriousness of those harms, outweighed the burden on the manufacturer to design a product that would have prevented those harms and the adverse effect that an alternative design that was practical and feasible would have on the usefulness of the product.  Specifically, the manufacturer Defendants failed to design the relevant product in a manner that would prevent the likelihood that a worker using the product would be injured by falling onto the dual augurs of the Screening Unit; a design that would not present a danger but instead would mitigate or eliminate the likelihood of injury and death under the circumstances Sergey Devyatkin encountered.

68.  <u>Ordinary Consumer</u>.   The relevant product was unsafe in design to an extent beyond that which would be contemplated by the ordinary consumer.

## B.  <u>FAILURES TO WARN AND/OR INSTRUCT</u>

69.  <u>Failures to Warn and/or Instruct</u>.  The relevant product that injured and killed Sergey Devyatkin was not reasonably safe because, at the time of manufacture:

    a.  Each Defendant failed to provide adequate warnings or instructions concerning the relevant product, including but not limited to providing product users, including but not limited to Sergey Devyatkin, notice and reminders in a manual, during instruction, and/or on the machine, of a protocol for safely avoiding the hazards presented by the relevant product's design; and/or

    b.  The likelihood that the relevant product would cause Plaintiffs' harms or similar harms, and the seriousness of those harms, rendered the warnings or instructions

COMPLAINT - 29

of Defendants inadequate and Defendants could have provided adequate warnings or instructions.

70. <u>Ordinary Consumer</u>.  Each Defendant's failures to warn rendered the relevant product unsafe to an extent beyond that which would be contemplated by the ordinary consumer.

**C.  <u>POST-MANUFACTURE FAILURES TO WARN AND/OR INSTRUCT</u>**

71. <u>Post-Manufacture Failures to Warn and/or Instruct</u>.  The relevant product that injured and killed Sergey Devyatkin was not reasonably safe because adequate warnings or instructions were not provided after the product was manufactured and before it injured him, because, on information and belief formed after a reasonable inquiry, after the relevant product was manufactured, one or more of the Defendants learned, or a reasonably prudent manufacturer should have learned, about the danger connected with the product that led to his injuries and death.  Accordingly, each Defendant was under a duty to act, with regard to issuing warnings or instructions, in a manner that a reasonably prudent manufacturer would act in the same or similar circumstances; including but not limited to providing notice and reminders in the manual, during instruction, and on the machine, of a protocol for safely avoiding the hazards presented by the relevant product's design.  Defendants did not satisfy this duty because they failed to exercise reasonable care to inform the relevant product's users, including but not limited to Sergey Devyatkin, of the danger and a safe way to avoid it.

**C.  <u>FOURTH CAUSE OF ACTION: BREACH OF IMPLIED WARRANTIES</u>**

72. Breach of Implied Warranties.  On information and belief, the Screening Unit did not conform to an implied warranty created by Title 62A RCW, because its design and

COMPLAINT - 30

STRITMATTER KESSLER WHELAN
KOEHLER MOORE
3600 15th Avenue West, Ste. 300
Seattle, WA 98119
206-448-1777

construction lacked appropriate safety features and instructions, and therefore it was not merchantable, RCW 62A.2-314, and was unfit for its particular purpose, RCW 62A.2-315.

### D.  FIFTH CAUSE OF ACTION:  NEGLIGENCE

73.    <u>Negligence.</u>  If any Defendant was a "product seller" but not a "manufacturer," within the meaning of the Washington Product Liability Act, Chapter 7.72 of the Revised Code of Washington, or was not a "product seller" within the meaning of that Chapter, and was by contract or otherwise obliged or designated to select and/or maintain the relevant product, to make that relevant product reasonably safe for foreseeable uses, and/or to transmit information concerning safely avoiding the hazards presented to workers using the relevant product, prior to attempting to use the product, but such a Defendant breached its duty to provide adequate information, instruction and/or warnings to Sergey Devyatkin, then such a Defendant was negligent in that failure.

74.    <u>Causation, Injuries and Damages</u>.   Defendants' breaches described in any and all causes of action described above caused Sergey Devyatkin's Estate to suffer injuries and special damages for expenses of medical attention and funeral/memorial and burial, lost wages and earning opportunities, and caused him and his mother to suffer general damages, in amounts to be proved at trial.

### VI. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

A.    For an award of damages compensating Plaintiff for the aforementioned injuries and past, present and future economic and non-economic damages in an amount to be proven at trial;

COMPLAINT - 31

1      B.      For an award to Plaintiff of Plaintiff's reasonable attorneys' fees and costs incurred

2    herein to the extent permitted by law;

3      C.      For an award to Plaintiff of prejudgment interest to the extent permitted by law; and

4      D.      For such other and further relief as the Court deems just.

5      DATED November 8, 2021.

STRITMATTER KESSLER KOEHLER MOORE

s/ Brad J. Moore
Brad J. Moore, WSBA #21802

s/ Daniel R. Laurence
Daniel R. Laurence, WSBA #19697

3600 15th Ave. W., Suite 300
Seattle, WA 98119
Telephone: 206-448-1777
brad@stritmatter.com
dan@stritmatter.com

Attorneys for Plaintiff

COMPLAINT - 32